Our next case for argument is 21-1360, Teva Pharmaceuticals v. Corcept Therapeutics. Mr. Rosendahl, please proceed when you're ready. May it please the Court. The drug at issue in this case, Coraline, is a tablet containing 300 mg of Mifepristone, and the FDA approved it to treat high blood sugar associated with tablets corresponding to 300, 600, 900, or 1200 mg. Coraline is metabolized by the CYP3A group of enzymes, and the prior art Coraline label states that medications that inhibit CYP3A could increase plasma Mifepristone concentrations, and dose reduction of Coraline may be required. In order to figure out how big a reduction in dosage would be appropriate if Mifepristone is administered together with a strong CYP3A inhibitor, the FDA required Corcept to carry out a standard drug-drug interaction study, or DDI study, with Mifepristone together with ketoconazole. Until the results of that DDI study became available, the FDA, as a precautionary measure, determined that not more than one Mifepristone tablet, or 300 mg, should be administered with a CYP3A inhibitor. Incidentally, Corcept's own expert admitted that 600 mg of Mifepristone would be the next logical dose after 300 mg to test for co-administration with CYP3A inhibitors, because it is the next highest dose in the FDA approved range. It would mean moving the maximum dose for co-administration from one daily tablet to two daily tablets. So Corcept carried out the DDI study and found that it would indeed be safe to administer two daily tablets of Mifepristone. Are you familiar with the concept of obvious to try? I'm sorry, Your Honor, I did not hear your question. Are you familiar with the concept of obvious to try? Yes, Your Honor. So this would fall into that category, right? I mean, the FDA suggested that they should  use a CYP3A inhibitor. It would be obvious to try, correct? Yes, Your Honor, it certainly would be obvious to try. Indeed, I would say that... Is the reasonable expectation of success requirement a separate requirement, or is it your view that because something is obvious to try, that there's always a reasonable expectation of success? Well, what the Supreme Court said in KSR, in that very famous passage about obvious to try, is that when there's pressure to solve a problem, there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her grasp, and if this leads to the anticipated success... Ah, anticipated success. That goes back to what we've termed the reasonable expectation of success in many of our cases. Yes, but it's clear that in this circumstance, the success is success in finding suitable dosages for co-administration. No, really, because that's not what they claimed. If they had written a claim to, air quotes, suitable doses of administration, that would really be a problem. That would fall right within the umbrella of what you're arguing, but they didn't. They filed a claim for a specific dose amount. So you have to prove that there was a reasonable expectation of success. Well, no, Your Honor, because once we're in the realm of routine optimization, I think it's clear from cases such as Applied Materials and Galderma that one doesn't need to know in advance the specific value that will be the result of the optimization. One simply has... Your view then is, again, you have collapsed, as I began, the motivation to try analysis with the reasonable expectation of success. You would like us to adopt a rule of law that once there's a motivation to try specific doses, it's irrelevant how a skilled artisan would think about their likelihood of success. Once there is a motivation to try, that is sufficient because only it is routine to, therefore, do those trials, and anything that results is obvious. Well, I don't think I would go quite that far. Well, yeah, you can't, because it's completely inconsistent with our case law. It's nonetheless what you're arguing. No, it's not quite what I'm arguing, Your Honor. There are two points that I would make. First of all, I don't think that this Court has any case law saying that it is necessary to be able to predict in advance the result of an optimization in order for the optimization case law to be applicable. Do we or do we not claim that you have to have a reasonable expectation of success? Yes, a reasonable expectation of success in solving the problem that the patent purports to solve, which in this case is to have a dosage suitable for treatment of Cushing syndrome when mifepristone is administered together with a strong CYP3A inhibitor. And of course, we do do that. We don't know a person of order— This patent didn't appear to me to be a hunting license. It didn't appear to me to cover a broad swath of dosages. It appeared to cover a specific dosage. So it seems to me the reasonable expectation of success would not be linked to the problem that you've laid out, but rather the claim, right? Don't we usually evaluate the obviousness of a claim as opposed to a problem in the prior art? Well, what the Court has said, for example— Do we evaluate the obviousness of a claim? Yes, of course, Your Honor. Okay, so wouldn't we then focus on the claim limitations? Yes, Your Honor. And what the Court has said, for example, in Ray Cuban, is that there needs to be a reasonable expectation of success in deriving the claimed invention in light of the teachings of the prior art. So here we have a situation where the problem is known. It is known that one needs to reduce the dosage of mifepristone when it's administered together with a strong CYP3A inhibitor. We don't know by how much, but we know that there is a routine and standard test that will allow us to figure out how much. And our point is that under those circumstances, where all you're trying to figure out is the magnitude of the change, then we are in the realm of routine experimentation and not inventiveness. Does the prior art show how the two drugs would work together, would interact? Yes, Your Honor. So the prior art says expressly, and the label says expressly, that because mifepristone is metabolized by this group of enzymes, an inhibitor of those enzymes would cause higher plasma blood levels of mifepristone, and therefore one would need to lower the dosage of the drug. And I think it might help to understand how we got here. What is your citation for that? For the proposition that one needs to lower the, yes, the label itself on appendix page 847. But the prior art disclosed how the two drugs would interact. The prior art discloses, well, the prior art discloses that because there's a tendency to raise the blood plasma levels, one would likely need to reduce the dosage when the two drugs are applied together. Now, one does not know exactly how big that effect is going to be. Well, but, yes, the prior art doesn't disclose, does it, the actual effect of the co-mingling or the co-reinitiation? It doesn't disclose the magnitude of the effect, right? It's clear that one has to do the tests to find out how big the effect is. And I think perhaps the best place to look for this, Your Honor, is at appendix page 694, which is the declaration that Dr. Greenblatt submitted together with the petition. The Greenblatt's declaration is irrelevant. The Board found him not credible because his testimony contradicted his declaration. And his testimony did. Why don't we turn to the testimony instead of the declaration, since the Board expressly found his contradictory testimony muted the declaration? Well, I think the Board, the point that was being made in the declaration, Your Honor, was slightly different. And there wasn't an actual contradiction. There was certainly, if one reads the passage in the declaration as standing for the proposition that one would have known in advance, because that was the question he was asked at his deposition, would you have known before conducting the DDI study specifically whether 600 milligrams was or was not safe? He said, no, you would need to carry out the study to figure out whether that particular dosage was or was not safe. But the point that was made in the declaration was that there is a wide range, and I'll point you to paragraph 142 on Appendix 694, where he said the results of the Mifepristone-Ketoconazole DDI study would not have been unexpected to APOSA. APOSA would have known that a wide array of outcomes, and this is the important point, ranging from a few percentage point increase to a 15 or 20-fold increase were possible. The 33 percent increase that CORSEP found was well within the range of outcomes that a skilled artisan would have expected. What this tells us is that when we start with a range of 300, 600, 900, or 1200 milligrams per day, then the range of possible outcomes is that same set of four tablets, because if the effect is very small, if the effect of the co-administration is very small, then four tablets per day would be just fine. Or, if it turns out that the effect is very large and the Mifepristone concentration spikes dramatically, then one would need to reduce the dose significantly. We have a range of up to four pills a day. When it's monotherapy. Well, yes, when it's monotherapy, and we know from this- What we actually know is from journal articles, when CYP3A is introduced, it was the governing belief at the time, according to the board's express fact-finding, and I believe it's page 47 of their opinion, pointing to the journal article at page 4164 of the appendix, that not more than 300 milligrams should be administered. Right, but what the board- So when there's co-administration, the journal articles, the medical evidence at the time, and the board's fact-finding, which we review for substantial evidence, which is clearly supported by the journal article, is that you should not administer more than 300 milligrams. No, Your Honor, respectfully, I disagree with that reading of the board's opinion. What the board said was that people of skill in the art would give weight to the 300 milligram amount in the label, and they would consider it safe. They would assume that the FDA would not allow 300 milligrams to be co-administered if it were not safe, but they also said that the 300 milligram limitation was not based on clinical data showing greater than 300 milligrams per day to be unsafe, and that is at appendix page 37. Page 47 of the board's opinion, the evidence supports that a POSA would have had no expectation as to whether co-administering dosages of mifepristone above 300 milligrams a day threshold set forth in the Corlin label would be successful. In the absence of evidence supporting an expectation that doses above 300 would be safe, we find petitioner has not carried its burden. Is that what the board held? What the board said, so the board said, again, relying... Why don't we try to go into page 48 of the board's opinion here? The evidence of record supports that the general working conditions limited co-administration of mifepristone with a strong CYPA3 inhibitor to just 300 milligrams a day, and then they cite the article, I believe it's the same article I was pointing to in the appendix for the quote, if used with a CYP3A inhibitor, the maximum dose should not exceed 300 milligrams a day. So it seems to me the board made an express fact finding that based on the current state of science at the time, mifepristone had to be limited to 300 milligrams a day if a CYP3A inhibitor was used. Well, again, Your Honor, I don't think that's a fair reading of that passage because the very same paragraph says, until additional drug-drug interaction data, I'm now four lines from the bottom of the page, the evidence says, until additional drug-drug interaction data become available, we suggest discontinuing and limiting to 300 milligrams a day. So people of skill in the art understood that there was no data on this, and the FDA required that the test be done to find the data, CORSEP did the test, found the data, and then tried to claim the result of the routine test. Because the understanding at the time as found by the board was that you cannot exceed 300 milligrams a day. Of course, it's going to be useful to see are there circumstances in which maybe you can, but the board's fact finding is that you could not exceed, safely, 300 milligrams a day based on the prevailing science at the time. No, Your Honor. Again, I would point you to appendix page 37. The board made no finding that above 300 milligrams would be unsafe. The board made no finding that people would have expected it to be unsafe. Page 48 and 49 of their opinion. Here the evidence of record supports the general working conditions limiting co-administration to just 300 milligrams a day. Then they cite multiple different sources saying if you're using the CYP3A inhibitor, dose should not exceed 300 milligrams a day. On the next page, daily dose should be 300 milligrams a day. Your Honor, that's definitely what the label says. The label says that when you're co-administering, until we get the data, you're not supposed to go above 300 milligrams per day. I'm not disputing that. What I'm saying, though. They're not quoting from the label. What they're quoting from are the articles at the time, the science about what was known to be safe. The articles at the time, I believe, were referring to the label, but nevertheless, it's clear that the board made a finding that the 300 milligram limitation was not based on clinical data and was not based on an expectation one way or another about safety above 300 milligrams per day. That's very important because this line that Your Honor keeps pointing to about the general conditions of the claim being limited to 300 milligrams per day is precisely the legal error that we are pointing to for the board. In this case, the talismanic words, the general conditions of the claim, are the board's way of saying we're not going to apply the range cases. We're not going to apply the routine optimization cases because we don't think they apply because there was this 300 milligram limitation in the label. Mr. Rosendahl, you've used all your time, all your rebuttal time, and you're beyond that. Let's hear from Mr. Stocks. Good morning, Your Honor. May it please the court. Kevin's not challenging. I'm not challenging any of the board's findings of fact, nor could it, because many of the board's key findings are based on Tevye's expert's own testimony where they agreed with Korsav's positions. That means that the board's findings concerning the scope and content of the prior art must be accepted for this appeal. These facts include whether a person of ordinary skill in the art would have had a reasonable expectation of success in achieving the claimed inventions and what general working conditions were disclosed by the prior art. Counsel made a point that the 300 milligram limitation in the Korsav Corlem label was not based on clinical data, citing to appendix page 37. Counsel crops that quote and doesn't continue on to page 38. The board found that while we agree that the 300 milligram limitation was not based on clinical experience, it was not spun out of whole cloth. We find that the person of skill in the art still would have given that limitation weight. The board goes on to refer to several journal articles and the testimony of the experts in the PGR. The journal articles include the Flissario article appendix page 1259 and the Morgan article appendix page 1272. Flissario actually goes beyond just admonishing not to go above 300, but actually teaches that ketoconazole, the CYP3A inhibitor at issue, should be discontinued 14 days before administering mifepristone. In other words, the teaching went even further that no dose of mifepristone should be co-administered with a strong CYP3A inhibitor. The board also found that a person of skill in the art would not have had a reasonable expectation of success, the administration of more than 300 milligrams per day of mifepristone and a strong CYP3A inhibitor would be safe. That's at appendix page 47 and also appendix pages 43, 47, and 49. I'm sorry, that first one was appendix page 45. The board also made over 10 pages of finding a fact that dose of mifepristone used in monotherapy do not apply to combination therapy with a strong CYP3A inhibitor. The board also found that the general working conditions limited co-administration of mifepristone with a strong CYP3A inhibitor to just 300 milligrams per day and do not encompass the claimed invention. These findings are dispositive of all the issues on appeal. Did your client invent 600 milligrams a day plus the CYP3A inhibitor? Our client was the entity that was the first approval of mifepristone, the only approval of mifepristone for the treatment of Cushing syndrome, and the only entity that ever ran any type of analysis to determine whether this was safe. As set forth in the patent, this was an iterative process. The company was extremely concerned that there would be no dose of mifepristone that would be safe with a strong CYP3A inhibitor. So studies were run on a much smaller scale to see if there was any possibility that the two drugs could be administered at the same time. I guess the difficulty, though, from my perspective is you didn't undertake that study at your own initiative. You were directed to undertake that study by the FDA, correct? The FDA, in the Lee reference, does have a discussion. This was a back and forth with the FDA, whether there should be a study run or whether there should be a complete ban on co-administration in the label. An agreement was reached that there would be a study run after the approval of the drug, a post-approval study. So, okay, help me understand just the timing. So your client came up with the method of treating Cushing syndrome through a combination of 300 milligrams of mifepristone plus CYP3A or any amount of mifepristone. I'm trying to understand why did the FDA prompt your client to undertake safety studies about this combination? What was the state of your client's invention at the time where the FDA said to do this? The drug was in the approval process, Your Honor. Approval process for what? Pre-approval for any dose. Any dose. Any dose in combination? No. With a CYP3A or just any dose of mifepristone? No, Your Honor, the latter. A monotherapy? A monotherapy. Okay. So your drug was in the FDA approval process as a monotherapy? Yes, Your Honor. And then how did it come up that CYP3A inhibitors could cause significant problems in combination with mifepristone? Sure. Based on the mechanism of action, there was a possibility of both a pharmacokinetic interaction. In other words, the two drugs together would, the CYP3A inhibitor would inhibit the metabolism of mifepristone, causing the blood levels to rise, potentially causing extreme safety issues such as adrenal insufficiency or hyperkalemia. The other possibility was a pharmacodynamic interaction. Some of the CYP3A inhibitors, notably ketoconazole, work by a different mechanism of action on the same condition. The ketoconazole prevents the synthesis of cortisol, and mifepristone blocks the activity of cortisol at the receptor. So there was a concern that even if the blood levels themselves weren't going to be affected, that the two drugs together could have a synergistic effect in the body and cause these potentially fatal interactions. Was that concern brought to your company's attention by the FDA, or was it something that you brought to the attention of the FDA? The latter. This was something that the company was concerned about running the studies at the outset and actually didn't want to have a complete ban on the co-administration of the two initially. Based on the back and forth, there was a, this is what comes out in Lee, that there was a question of whether any dose would be possible. And this is the discussion that... Okay. So is this a fair characterization of the facts, and are these in the record? Meaning that you brought to the FDA's attention a concern about co-administration, and then the FDA responded by ordering you to undertake testing to ensure the safety and efficacy. I know that latter part is in this record, is the former part in this record, as far as we know. In the board's decision on APPX36, it states that Lee... That doesn't answer the specific question. Lee also states that the use of strong CYP3A4 inhibitors is proposed to be contraindicated by the sponsor. Okay. And that sponsor recommended administration of moderate CYP3A inhibitors also be avoided. So yes, Your Honor. And so the FDA said, well, I won't approve the co-administration until you do safety and efficacy studies. Go ahead, clarify what I'm getting wrong. I'm just trying to... So the FDA and the company, I guess your answer is that the company chose what studies to run. So it seems to me that we have multiple doctrines in the obviousness area, one of which is called obvious to try. And it feels to me like this falls into that category based on the back and forth between your company and the FDA that it sort of became obvious to try and explore which doses would be safe. No, Your Honor. At the time of the invention, there was a very strong teaching in the art that the two things should not be co-administered. And if it was actually... Not at all or not at more than 300 milligrams? The preference was not at all. And it was, if medically necessary, they were permitted to go up to 300 milligrams. So the preference was not at all as set forth in the journal articles and in the testimony of the experts in the case. With respect to the obvious to try, the concept that set forth in KSR focused on the predictable solutions. Here, the board found repeatedly that the solution here, going above 300 milligrams, was not predictable. And that was focused both on the specific 600 milligram dose as well as any dose above 300 milligrams generally. And that finding on the reasonable expectation of success is not challenged and therefore dispositive on the obviousness to try issue. And the reasonable expectation of success prong is, as you understand it, a separate requirement from whether it's obvious to try something. You know, it could be obvious to try it, but there still has to be a reasonable expectation of success in order to satisfy obviousness. The reasonable expectation of success is the predicate before you get to trying anything. Does that answer your question, Your Honor? Not really. Because if that were the case, then what if the FDA had actually given you a document that said, we'd like you to give us the results of a study administering mifepristone in each of the relevant dose amounts, 300, 600, 900, and 1,200, to a coextensive CYP3A inhibitor user? You know, what if they had sort of pushed with sort of a roadmap with great clarity of exactly what they wanted you to do? I mean, it seems like that would make it awfully obvious to do that, right? If the facts, I mean, we could spin different facts that may come to a different conclusion. But here, I mean, the focus for the KSR obvious to try is on an identified predictable solution. So the solutions need to be predictable. In other words, there needs to be an expectation that those solutions would yield the claimed invention. So without predictable solutions, you can't have obviousness to try. So without the solution, but didn't the FDA tell you to go explore the level at which these two things could be used in combination? The FDA was concerned that there could be no dose of a strong CYP3A inhibitor that could be used in conjunction with mifepristone. And in that situation, that's why there was a discussion of moderate CYP3A inhibitors. If the dose was zero, the next things to look at was moderate CYP3A inhibitors. And that was, that's the appendix at 35 to 36 in the discussion of the Lee reference. And did the FDA approve 300 milligrams plus the CYP3A inhibitor? I kind of thought it did, but I may not remember. It's not part of the indication, Your Honor. It's in the warnings and precautions and in the pharmacokinetic interaction section, there is a statement in it that essentially says, if medically necessary, you co-administer but limit the dose of the strong CYP3A inhibitor to no more than 300 milligrams. If you have no other questions, Your Honor, I'll wait the rest of my time. Okay. Mr. Rosenthal, I'll restore two minutes of rebuttal time. Thank you, Your Honor. Two points. First of all, the logic underlying this court's range optimization precedence is that the existence of a range creates an implicit motivation for people of skill in the arts to find optimal values within the range. But in this case, the motivation was explicit, not implicit. The Lee document, which was part of the FDA approval package, and the FDA requirement was that there should be a DDI study for the purpose of determining the appropriate dose, the extent to which dose reduction would be required. And so for people of skill in the art to go down the path prescribed in the prior art to carry out the optimization is not inventive. It is simply the product of routine optimization. I think the most charitable reading of the board's decision on the range optimization cases was they refused to apply those cases because they determined that 600 milligrams or greater than 300 milligrams had not been shown to be co-administered in the prior art with a strong CYP3A inhibitor. I think implicit in the passage that Judge Moore pointed us to earlier is this notion that if there had been a prior art reference that said 300 to 900 milligrams with a strong CYP3A inhibitor and the patent claims 600 in the middle of the range, then that would have been fine. But what we know from the Valiant case is that focusing exclusively on a range that is exactly what is in the claim is not appropriate. And if there are other ranges in the prior art that point to the appropriate range, and here we have a monotherapy range that goes up to 1,200 milligrams, and we know that somewhere between 300 and 1,200 is going to be the safe dose for co-administration, then when you carry out the experiment to find out the right answer, that's not inventive, that's simply routine. How is it that we know somewhere between 300 and 1,200 is going to be the safe amount? It seemed to me that all of the evidence of record was not to do it at all, and if you have to do it, don't go above 300. But you just wanted to get to obviousness by saying that everybody knew the correct amount was somewhere between 300 and 1,200. Well, it is that same passage, Your Honor, that I pointed you to in the Greenblatt declaration, which is undisputed. I don't think there's any contradictory evidence in the record that the range of possible outcomes of the DDI study could be a negligible effect all the way up to a very extreme effect. And the reason why we were making that argument and why Dr. Greenblatt put in that evidence, and this is, again, Appendix 694, Paragraph 142, is because the way they got the patent in the first place was by claiming unexpected results. They said that there was an extreme spike in concentrations when the two drugs would be co-administered, and therefore the expected range of outcomes for a DDI study would not include anything above 300 milligrams. And that is what Dr. Greenblatt was rebutting, and that is what the board found not to be true. They found that it was not unexpected, that there wasn't this huge spike in concentrations, would not have been expected, and there wasn't an expectation that it would be unsafe. There was an expectation that it could be anywhere in the range, but you wouldn't know until you did the study where in the range it would fall. Okay, counsel, you've exceeded your time. I thank both counsel. The argument is taken under submission.